[No. B083489. Second Dist., Div. Seven. June 17, 1996.]

TRANSWESTERN PIPELINE COMPANY, Plaintiff and Respondent, v. MONSANTO COMPANY, Defendant and Appellant.

506

**COUNSEL**

Preuss, Walker & Shanagher, Charles F. Preuss, Vernon I. Zvoleff and Alan J. Lazarus for Defendant and Appellant.

Fred J. Hiestand as Amicus Curiae on behalf of Defendant and Appellant.

Sherman & Sterling, James Tallon, Janet Grady and Jerry Marks for Plaintiff and Respondent.

**OPINION**

JOHNSON, J.—Plaintiff, whose business is the interstate transportation of natural gas, contaminated the Southern California Gas Company's pipeline with gas containing polychlorinated biphenyls (PCB's). After settling the gas company's damage claim, plaintiff sought equitable indemnity from the PCB manufacturer on several theories including strict liability for design defect and negligent failure to warn of the environmental hazards of PCB's. A jury found the manufacturer 37.5 percent responsible for the PCB contamination and awarded plaintiff damages accordingly.

We conclude the PCB manufacturer cannot avoid liability based on the conflicting terms of purchase and invoice forms exchanged by the parties and that plaintiff is not guilty of laches. On the merits, we find contamination of the gas company's pipeline system constituted property damage, not economic loss, and therefore the PCB manufacturer is liable to plaintiff for

equitable indemnity based on the jury's finding of comparative negligence. We also uphold the award of future damages based on plaintiff's continuing legal obligation to contribute to the gas company's remediation costs.

FACTS AND PROCEEDINGS BELOW

The Transwestern Pipeline Company (Transwestern) is in the business of transporting natural gas from Texas and Oklahoma to California where its pipes connect with pipes belonging to the Southern California Gas Company (SoCalGas). On its way to California the gas passes through stations which compress it, thus allowing more gas to be transported through the pipeline. In 1968, a Transwestern compressing station in New Mexico was destroyed in a gas explosion. In the process of rebuilding the station Transwestern installed a new turbine-driven gas compressor. The compressor used a lubricant manufactured by the Monsanto Company (Monsanto) known as Turbinol. Turbinol is a synthetic fire-resistant lubricant consisting mostly of PCB's.

The Texas Eastern Transmission Company (Texas Eastern), Transwestern's parent company, began using Turbinol in the late 1950's or early 1960's as a substitute for flammable petroleum-based lubricants in its gas compressors. Texas Eastern was among the first companies to use Turbinol and participated in its development. The Turbinol used in Transwestern's new compressor came from supplies Texas Eastern purchased from Monsanto. We discuss the facts surrounding the sales agreements between Texas Eastern and Monsanto in part I below.

In 1966, Monsanto learned PCB's were turning up in the environment. Traces were found in plants, animals and humans. Although no one was sure at the time how much of a risk this chemical posed, its presence in the environment was a serious concern to Monsanto. In 1970, Monsanto began placing a supplemental warning label on some of its products containing PCB's but not on drums of Turbinol. Not until 1972 did Monsanto reveal to Texas Eastern and Transwestern that PCB's posed a substantial risk of environmental contamination. At the same time, Monsanto also informed Texas Eastern and Transwestern it was going to stop making Turbinol. It offered to sell its remaining Turbinol to the two companies but only if they signed an agreement to indemnify and hold Monsanto harmless for any damages Turbinol caused them or their customers. Texas Eastern and Transwestern refused to sign the agreement. In late 1972 Transwestern found and began using a substitute for Turbinol which did not contain PCB's.

PCB's were first discovered in residential gas lines in 1981. As a result, all natural gas pipeline companies in the United States tested for PCB

contamination. When SoCalGas tested its pipelines it discovered they were contaminated with PCB's. SoCalGas notified Transwestern of the PCB contamination and its belief Transwestern was the source. Transwestern's own tests revealed Turbinol leaking from its compressor in New Mexico had contaminated its entire pipeline west to Needles where it entered the SoCalGas pipeline thus introducing PCB's into the entire SoCalGas distribution system. Because they could not readily ascertain the extent of contamination and the costs of repair, Transwestern and SoCalGas entered into a "standstill agreement." This agreement tolled applicable statutes of limitations in order to allow time to ascertain the nature and extent of SoCalGas's damages and for settlement negotiations between the parties. The period of investigation and negotiation lasted nine years until the parties finally reached a settlement in 1990. Neither Transwestern nor SoCalGas informed Monsanto they had discovered PCB's in their pipelines. Monsanto first learned about this contamination in 1989 when its records were subpoenaed in an arbitration proceeding between Transwestern and SoCalGas.

If the PCB's remained confined inside the SoCalGas pipelines they would pose no danger. But PCB's cannot be confined inside the pipes. The PCB's mix with pipeline condensate, liquids which form naturally inside the pipes. This pipeline condensate must be removed on a regular basis or else it will clog up the pipes and impede the flow of gas. The PCB's enter the outside world when the condensate is removed from the pipes. Even though Transwestern stopped using Turbinol in 1972, once the PCB's entered the SoCalGas pipelines they coated and clung to the pipe walls and thus continued to infect the pipeline condensate more than 20 years later. No technique exists for removing PCB's once they have entered a pipeline. As one expert testified, once the PCB's entered its pipeline system, "SoCal was done for."

Because the condensate in its pipelines contained detectable levels of PCB's, federal regulations required SoCalGas to take special precautions in its collection, storage and disposal, to monitor the PCB levels in the condensate and to conduct special training of its employees in the handling of condensate removed from the pipelines. This special handling and cleanup effort cost SoCalGas over $1 million a year.

In 1987, SoCalGas initiated an arbitration proceeding against Transwestern to recover damages resulting from the costs associated with the collection, storage and disposal of the contaminated condensate and the efforts to remove the PCB's from its pipelines. In 1990, the parties entered into a settlement under which Transwestern paid SoCalGas approximately $10

million for costs associated with the PCB contamination. Two years later, the parties entered into a further agreement under which Transwestern agreed to pay 86 percent of the continuing costs of handling the PCB contamination. The initial term of this agreement was three years with automatic renewal for two-year periods until canceled by either party.

Following its settlement with SoCalGas, Transwestern brought this action for equitable indemnity against Monsanto. The parties stipulated as of the date of trial Transwestern had paid SoCalGas $12 million for PCB remediation. The parties further stipulated these expenses were either legally required or incurred by SoCalGas out of caution and were paid pursuant to a reasonable settlement between Transwestern and SoCalGas. As to future damages, the current and former heads of the PCB program at SoCalGas testified the company's PCB-related costs had been running approximately $1.3 million annually for the past three to four years and would continue at that rate for the next ten to twenty years assuming no change in federal environmental regulations.

The case was tried to a jury. The jury returned a special verdict in favor of Transwestern on two theories: strict liability for design defect and negligent failure to warn. It also found Transwestern was negligent or failed to mitigate damages. The jury apportioned 62.5 percent of the responsibility for SoCalGas's damages to Transwestern and 37.5 percent to Monsanto. It fixed the present value of SoCalGas's future damages at $11.4 million. Judgment was duly entered and Monsanto filed a timely notice of appeal.

DISCUSSION

I. *The Limitations on Liability Contained in Monsanto's Invoices Did Not Become Part of the Contracts Between Monsanto and Texas Eastern or Transwestern.*

In defending against Transwestern's claims, Monsanto relied in part on the limitation of liability clauses contained in its invoices for the sale of Turbinol to Texas Eastern, Transwestern's parent company. These clauses purported to disclaim any liability for consequential damages and limited the buyer's other damages to the purchase price of the particular order. Monsanto contended Texas Eastern assented to these limitations on liability at the outset of the parties' relationship. It further contended the limitations clauses had become part of the contracts for sale of Turbinol to Texas Eastern through a course of dealing between the parties over a 12-year period from 1960 to 1972. Therefore, Monsanto concluded, because Texas Eastern acted as Transwestern's agent in purchasing Turbinol, the limitations on liability were imputed to Transwestern.

The trial court directed a verdict against Monsanto on this defense. The court concluded Monsanto had failed to establish the limitations on liability contained in its invoices had become part of its sales agreements with Texas Eastern through express agreement or a course of dealing. Thus, even if Texas Eastern acted as Transwestern's agent in purchasing the Turbinol, as the jury subsequently found, the limitations on liability could not be imputed to Transwestern because they were not binding on its agent, Texas Eastern. For the reasons explained below, we conclude the trial court correctly found Monsanto's limitation of liability clauses did not become part of its contracts with Texas Eastern.

■   The facts pertaining to Monsanto's limitation of liability defense are undisputed. Therefore, we independently review the trial court's interpretation of the Monsanto-Texas Eastern contracts. (*Therma-Coustics Manufacturing, Inc.* v. *Borden, Inc.* (1985) 167 Cal.App.3d 282, 294-295 [213 Cal.Rptr. 611].)

The evidence showed in the mid-1950's Texas Eastern began searching for a synthetic fire-resistant lubricant to replace flammable petroleum-based lubricants in the turbines at its natural gas booster stations. One of the products it evaluated was Monsanto's Turbinol. In the course of this evaluation, Monsanto advised Texas Eastern any sale of Turbinol would be conditioned upon Texas Eastern bearing the risk of "any difficulties which may develop or any damage which may result from its use." Texas Eastern asked an independent testing laboratory "to determine if possible if there are any characteristics of the machine-synthetic lubricant combination which will cause damage to the machine and make this lubricant intolerable to use." The laboratory was also asked to determine if Turbinol would protect against bearing failure in the turbines, whether it would "be detrimental to the operation of the machine," and to recommend controls "to measure degradation of the lubricant or parts of the turbine as operation proceeds." There is no evidence of the results of the Turbinol tests but it is undisputed Texas Eastern had begun purchasing Turbinol for its own use by December 1960.

Texas Eastern acquired Transwestern in 1967 and the following year began purchasing Turbinol on behalf of Transwestern. Texas Eastern continued purchasing Turbinol for its own use and on behalf of Transwestern until 1972. In January 1972, Monsanto advised Texas Eastern and Transwestern it would not sell them any more Turbinol unless they agreed to indemnify Monsanto against any and all liability arising out of its use including any damage to people, animals or the environment. This proposed

agreement applied to past as well as future sales of Turbinol. Texas Eastern and Transwestern refused to enter into this proposed agreement and ceased purchasing Turbinol.

During the 12 years Texas Eastern purchased Turbinol its purchase orders contained no limitations on its remedies or on Monsanto's liability. Monsanto's invoices for the sale of Turbinol, however, did contain provisions limiting its liability to the buyer. The most recent version of the invoices Monsanto sent Texas Eastern provided: "Buyer's exclusive remedy shall be for damages, subject, however, to Buyer's agreement that for any and all losses or damages resulting from any cause whatsoever including alleged defective or damages goods, Seller's liability shall in no event exceed the purchase price thereof . . . . In no event shall seller be liable for incidental or consequential damages."

Commencing in 1968 Monsanto also added a term to its invoices which provided that where, as in the present case, no separate written contract existed between Monsanto and the buyer "we accept your order only on the express condition that you assent to the terms contained above and on the reverse side hereof, and your acceptance and receipt of the goods shipped hereunder shall constitute assent to such terms."[1]

■ Where a commercial buyer and seller seeking to make a deal exchange forms containing inconsistent provisions, California Uniform Commercial Code section 2207 governs the existence of a contract and its terms.[2] Section 2207 provides in relevant part:

"(1) A definite and seasonable expression of acceptance . . . operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, *unless acceptance is expressly made conditional on assent to the additional or different terms.*

"(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract *unless*:

---

[1]Despite the last clause in this sentence, Monsanto does not contend acceptance and receipt of the Turbinol constituted assent to the limitations on liability contained in the invoices. In *Diamond Fruit Growers, Inc.* v. *Krack Corp.* (9th Cir. 1986) 794 F.2d 1440, 1444-1445, the court held that to treat the buyer's acceptance and receipt of the goods as an assent to the terms in the seller's acknowledgment of the order would be inconsistent with the principles of neutrality embodied in Uniform Commercial Code section 2-207 and would reinstate the "last shot rule" section 2-207 was intended to abolish. (See discussion below.) California adopted the official text of Uniform Commercial Code section 2-207 without change. (Cal. U. Com. Code, § 2207.)

[2]All further statutory references are to the California Uniform Commercial Code unless otherwise noted.

"(a) The offer expressly limits acceptance to the terms of the offer;

"(b) They materially alter it . . . .

"(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, *together with any supplementary terms incorporated under any other provisions of this code.*" (Italics added.)

Section 2207 replaces the common law "mirror image" rule which required an acceptance to "mirror" the offer, i.e., to reiterate all terms and conditions exactly. (See, e.g. *Apablasa* v. *Merritt & Co.* (1959) 176 Cal.App.2d 719, 726 [1 Cal.Rptr. 500].) A purported acceptance at variance with the offer was treated under the common law as a counteroffer which was deemed accepted if the offeror proceeded to perform. (*Diamond Fruit Growers, Inc.* v. *Krack Corp., supra,* 794 F.2d at p. 1443.) As a general rule, under section 2207 the common law counteroffer becomes an acceptance if it contains a "definite and seasonable expression of acceptance" and, between merchants, the additional terms of the "counteroffer" become a part of the contract. (§ 2207, subds. (1), (2).) The foregoing rule does not apply if the offeree expressly conditions its acceptance on the offeror's assent to the offeree's additional terms. (§ 2207, subd. (1).) However, even if the offeree's acceptance is expressly made conditional on the offeror's assent to the offeree's additional terms, and no such assent is given, the existence of a contract and its terms may nevertheless be inferred if the parties' conduct recognizes the existence of a contract. In such case, the terms of the contract are those on which the parties' writings agree plus any supplementary terms incorporated into the contract under any other provisions of the California Uniform Commercial Code. (§ 2207, subd. (3).)

In the present case, Monsanto expressly conditioned its acceptance of Texas Eastern's purchase orders on Texas Eastern's assent to the additional limitation of liability terms contained in Monsanto's invoices. Monsanto's acceptance, substantially in the language of section 2207, subdivision (1), stated Monsanto accepted Texas Eastern's purchase order "only on the express condition that you assent to the terms" contained in the invoice. Therefore, we must determine whether Texas Eastern expressly or impliedly assented to Monsanto's liability limiters.

A.   *Texas Eastern Did Not Expressly Assent to Monsanto's Limitation of Liability Clauses.*

█   Monsanto argues Texas Eastern specifically assented to the limitation of liability clauses in 1960 when it first began purchasing Turbinol after

being specifically advised by Monsanto any sale of Turbinol would be conditioned upon Texas Eastern's bearing the risk of "any difficulties which may develop or any damage which may result from its use." The record does not support this argument. Monsanto introduced no evidence showing Texas Eastern expressly agreed to any limitation on Monsanto's liability.[3] The evidence Monsanto introduced showed at the time Texas Eastern was trying to decide whether to use Turbinol it was concerned about whether Turbinol would damage its turbines, not whether Turbinol would damage people, animals or the environment. Thus, to the extent any agreement to limit Monsanto's liability can be inferred from Texas Eastern's conduct the agreement only applied to Monsanto's liability for damage to the turbines. Our conclusion is supported by Monsanto's attempt in 1972 to obtain Texas Eastern's assent to a specific limitation on Monsanto's liability for damages to third parties arising from past as well as future sales of Turbinol. Monsanto's request for such a liability limiter in 1972 would not have been necessary if Texas Eastern had already agreed to such a limitation in 1960.

B. *Texas Eastern's Assent to the Limitation of Liability Clauses Cannot Be Inferred From the Parties' Course of Dealing.*

Because Monsanto's acceptance of Texas Eastern's purchase orders was expressly made conditional on assent to Monsanto's additional terms, no contract was formed under section 2207, subdivisions (1) and (2). Instead, this case is governed by section 2207, subdivision (3) which, as we have explained, recognizes a de facto contract between the parties based on those terms on which the parties did agree plus any supplementary terms incorporated under any other provisions of the California Uniform Commercial Code.

A comment to section 2207, subdivision (3) addresses the precise situation we have here: "In many cases, as where goods are shipped, accepted and paid for before any dispute arises, there is no question whether a contract has been made. . . . The only question is what terms are included in the contract, and subsection (3) furnishes the governing rule." (Com., 23A West's Ann. Cal. U. Com. Code, § 2207, par. 7 (1995 pocket supp.) p. 42.) The governing rule is that one party should not be able to impose its terms and conditions on the other simply because it fired the last shot in the battle of forms. "Instead, all of the terms on which the parties' forms do not agree drop out, and the [Uniform Commercial Code] supplies the missing terms." (*Diamond Fruit Growers, Inc.* v. *Krack Corp. supra,* 794 F.2d at p. 1444.)

---

[3]Monsanto claims Transwestern's unreasonable delay in bringing this action prevented Monsanto from introducing such evidence. We reject this argument for the reasons stated in part II below.

■ Monsanto argues its liability limiters became "supplementary terms" of the contracts as a result of the parties' course of dealing over a 12-year period.

We agree with Monsanto the "supplementary terms" referred to in section 2207, subdivision (3) may include terms incorporated as a result of the parties' course of dealing. Subdivision (3) refers to "supplementary terms incorporated under any other provisions of this code." Section 1201, subdivision (3) defines an " 'agreement' " as: "[T]he bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing . . . ." A course of dealing is "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." (§ 1205, subd. (1).) A course of dealing may "give particular meaning to and supplement or qualify terms of an agreement." (§ 1205, subd. (3).) (Cf. *Dresser Industries* v. *Gradall Co.* (7th Cir. 1992) 965 F.2d 1442, 1450-1451 [construing similar provisions in Wisconsin Commercial Code].)

Thus, the issue boils down to whether the exchange of forms containing inconsistent provisions as to liability and remedies, over a long period of time, can "fairly be regarded as establishing a common basis of understanding" between the parties as to their respective liability and remedies.

Common sense tells us the mere exchange of forms containing inconsistent terms, for however long a period, cannot establish a common understanding between the parties as to which set of conflicting terms is part of their contract. Although Monsanto repeatedly stated in its invoices its acceptance was conditioned on assent to its liability limiters, Texas Eastern never expressed such assent. Moreover, Texas Eastern's purchase orders repeatedly stated terms and conditions which contained no limitations on Monsanto's liability. Under these circumstances, we see no reason why Monsanto's form disclaiming liability and limiting Texas Eastern's remedies should be accepted over Texas Eastern's form which contained no such limitations. Each party is equally entitled to claim its terms and conditions constituted the parties' "course of dealing." (*Lockheed Electronics Co.* v. *Keronix, Inc.* (1981) 114 Cal.App.3d 304, 312-313 [170 Cal.Rptr. 591] [parties' repeated use of forms containing inconsistent terms did not establish a course of dealing].) Furthermore, the fact this battle of the forms went on for 12 years makes Monsanto's argument even less tenable. The longer such a battle continues, the more obvious it is the parties have not reached an agreement over the terms in dispute.

*Step-Saver Data Systems, Inc.* v. *Wyse Technology* (3d Cir. 1991) 939 F.2d 91 is directly on point and supports our conclusion. *Step-Saver* involved the plaintiff's action for breach of warranty against a software manufacturer, TSL. TSL defended, in part, on the basis of its limitation of warranty printed on each of the one hundred forty-two boxes of software it sold to plaintiff in approximately seven transactions over a one-year period. TSL contended its repeated expression of this limited warranty became a part of the parties' contract through their course of dealing. The trial court accepted this contention and directed a verdict in favor of TSL on the breach of warranty claim. The Third Circuit reversed, holding: "[T]he repeated sending of a writing which contains certain standard terms, without any action with respect to the issues addressed by those terms, cannot constitute a course of dealing which would incorporate a term of the writing otherwise excluded under [UNIFORM COMMERCIAL CODE] § 2-207." (*Id.* at p. 104.)

The court gave two reasons for its holding. "First, the repeated exchange of forms by the parties only tells Step-Saver that TSL desires certain terms. Given TSL's failure to obtain Step-Saver's express assent to these terms before it will ship the program, Step-Saver can reasonably believe that, while TSL desires certain terms, it has agreed to do business on other terms—those terms expressly agreed upon by the parties. Thus, even though Step-Saver would not be surprised to learn that TSL desires the terms of the box-top license, Step-Saver might well be surprised to learn that the terms of the box-top license have been incorporated into the parties' agreement. [¶] Second, the seller in these multiple transaction cases will typically have the opportunity to negotiate the precise terms of the parties' agreement, as TSL sought to do in this case. The seller's unwillingness or inability to obtain a negotiated agreement reflecting its terms strongly suggests that, while the seller would like a court to incorporate its terms if a dispute were to arise, those terms are not a part of the parties' commercial bargain. For these reasons, we are not convinced that TSL's unilateral act of repeatedly sending copies of the box-top license with its product can establish a course of dealing between TSL and Step-Saver that resulted in the adoption of the terms of the box-top license." (939 F.2d at p. 104, fn. omitted.)

The rationale for not incorporating the seller's liability limiters into the parties' contracts is even stronger in the present case than in *Step-Saver*. Here, after 12 years of sending acceptances expressly conditioned on Texas Eastern's assent to Monsanto's limitations on liability, Monsanto actually met with Texas Eastern in an attempt to persuade Texas Eastern to accept these limitations retroactively. Texas Eastern refused to do so. This belated attempt to obtain agreement to its liability limiters can be viewed as an

admission no such agreement existed by course of dealing. Furthermore, Monsanto's belated attempt to obtain express agreement to its limitations on liability highlights the fact that Monsanto is responsible for its current predicament. As another court has observed, the seller cannot be heard to complain if it inserts a term in its acceptance which requires the buyer's assent and then does not enforce that requirement. "If the seller truly does not want to be bound unless the buyer assents to its terms, it can protect itself by not shipping until it obtains that assent." (*Diamond Fruit Growers, Inc.* v. *Krack Corp., supra,* 794 F.2d at p. 1445.)

■   Incorporating Monsanto's limitations on liability into its contracts with Texas Eastern would be unfair for another reason. Monsanto's limitations on liability were intended to relieve it of otherwise well-established legal duties and obligations. If given effect, they would shift the burden of paying for the damage caused by Turbinol from the manufacturer to the buyer. While public policy generally permits the transfer of risk for consideration, a court will not find such a transfer has occurred unless it can be "reasonably certain" the party receiving the burden voluntarily accepted it and received an adequate consideration for the transfer. (*Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92, 101 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693].)[4] We do not believe a party charged with significant legal duties and responsibilities can reasonably rely on its boilerplate form, contradicted by the other party's boilerplate form, to shift substantial economic burdens from itself to the other party, especially where it created the ambiguity as to acceptance of its terms by not insisting on its terms when it had numerous opportunities to do so.

Cases such as *Capitol Converting Equipment* v. *LEP Transport* (7th Cir. 1992) 965 F.2d 391; *Union Carbide Corp.* v. *Oscar Meyer Foods Corp.* (7th Cir. 1991) 947 F.2d 1333 and *Schulze and Burch Biscuit Co.* v. *Tree Top, Inc.* (7th Cir. 1987) 831 F.2d 709, relied on by Monsanto, are not on point. None of these cases involved the use of a course of dealing to supplement the terms of the parties' contract under Uniform Commercial Code section 2-207, subdivision (3). Rather, in each of these cases, the offeree's additional terms became part of the parties' contract under Uniform Commercial Code section 2-207, subdivisions (1) and (2) unless they materially altered the contract. (See discussion *ante,* pp. 515-516, on the distinction between incorporating terms under subdivision (2) and subdivision (3).) In *Schulze,*

---

[4] Exculpatory clauses which affect the "public interest" are void. (60 Cal.2d at p. 96.) However, it does not appear to us the exculpatory clauses at issue here involve the public interest as defined in *Tunkl* v. *Regents of University of California* at pages 98-101 and Texas Eastern does not make such a claim.

the court held that in light of the parties' prior course of dealing the offeror could not claim it was surprised by the offeree's additional term in its acceptance which was identical to the additional term in its nine previous acceptances. (831 F.2d at pp. 714-715.) In *Union Carbide*, the court held that although the buyer had complied with the seller's additional terms regarding payment of sales taxes for eight years, the seller's new interpretation of the meaning of those terms constituted a material alteration of the parties' contract and therefore assent to the new interpretation could not be inferred from the parties' course of dealing. (947 F.2d at pp. 1336-1338.) In *Capitol Converting,* plaintiff sued defendant for damages after defendant failed to deliver goods it was transporting for plaintiff. The court held plaintiff was bound by the defendant's invoice limiting plaintiff's damages to $50 for each undelivered package. This same limitation of liability had appeared on defendant's invoices in each of "hundreds of transactions" between the parties. The court did not specifically rely on Uniform Commercial Code Code section 2-207, subdivision (2) but it is clear from the facts of the case the additional terms limiting liability formed part of the contract under the provisions of that section. (965 F.2d at pp. 395-396.)

For the reasons explained above, we conclude the conflicting terms and conditions on liability contained in the forms exchanged by the parties failed to establish a course of dealing and Monsanto's liability limiters did not become a part of the parties' contracts.

II. *Transwestern's Claim for Equitable Indemnity Is Not Barred by Laches.*

Monsanto contends Transwestern unreasonably delayed in giving it notice of SoCalGas's claims against Transwestern and hence of Monsanto's potential liability for indemnification. As a result of this unreasonable delay, Monsanto alleges, documents and witnesses which could have aided Monsanto's defense to Transwestern's indemnity claim were lost or became unavailable. The trial court took extensive evidence and heard lengthy argument on Monsanto's laches defense before and after trial and found the defense lacked merit.

The affirmative defense of laches requires unreasonable delay in bringing suit and resulting prejudice to the defendant. (*Miller* v. *Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624 [166 Cal.Rptr. 826, 614 P.2d 258].) Whether laches has occurred in a particular case is primarily a question of fact for the trial court and an appellate court will not interfere with the trial court's decision unless it is obvious a manifest injustice has

occurred or the decision lacks substantial support in the evidence. (*Vernon Fire Fighters Assn.* v. *City of Vernon* (1986) 178 Cal.App.3d 710, 724-725 [223 Cal.Rptr. 871].) We find no basis to disturb the trial court's exercise of discretion in this case.

On the issue of unreasonable delay, Monsanto concedes Transwestern's cause of action for equitable indemnity did not accrue until Transwestern made payment under its settlement agreement with SoCalGas. (*Valley Circle Estates* v. *VTN Consolidated, Inc.* (1983) 33 Cal.3d 604, 611 [189 Cal.Rptr. 871, 659 P.2d 1160].) Monsanto also concedes Transwestern filed this indemnity action approximately nine months after suffering loss, well within the statute of limitations. Nevertheless, Monsanto argues, the fact Transwestern filed its indemnity action within the limitations period is not dispositive on the issue of unreasonable delay. (See *Resource Defense Fund* v. *County of Santa Cruz* (1982) 133 Cal.App.3d 800, 809 [184 Cal.Rptr. 371].) Laches is an equitable safeguard which operates independently of the statute of limitations and exists to assure defendants are not confronted with stale claims. (See *Maguire* v. *Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719, 736 [146 P.2d 673, 151 A.L.R. 1062].) If the only relevant inquiry was when the statute of limitations began to run, a party who knew it had an indemnity action waiting in the wings could drag out settlement or trial of the underlying claim in the hope the longer it delayed bringing the indemnity action the more difficult it would be for the alleged indemnitor to defend itself due to loss of key evidence and witnesses. Monsanto contends this is precisely the strategy Transwestern followed in the present case.[5]

Monsanto has not cited, nor have we found, any reported decision in California or any other jurisdiction holding in a case of equitable indemnity the indemnitee owes a duty to notify the indemnitor of its claim before it matures. We agree with Monsanto, however, a bad faith delay in giving notice would be inherently "unreasonable." Monsanto's difficulty in the present case is that the trial court found the evidence did not support its claim of unreasonable delay and the record supports the trial court's finding.

The evidence regarding the settlement between SoCalGas and Transwestern is undisputed. In 1981 SoCalGas discovered PCB's were entering its pipelines at the point where they connected with Transwestern's pipeline near Needles, California. Transwestern's own investigation confirmed this fact. Soon after this discovery, SoCalGas and Transwestern began discussing

---

[5]Although Monsanto characterizes its defense as one based on laches, it more closely resembles a defense based on unclean hands. In any event, the label we attach to this defense does not affect our analysis.

the removal of the PCB's and who would pay for the cleanup and how much. In 1983, SoCalGas and Transwestern entered into a "standstill" agreement which recited "[i]n light of the uncertainties and speculation regarding the extent of the hazard, if any, presented by such PCB's, as well as the costs associated with eliminating the PCB's and any such hazard" the two companies would refrain from instituting any arbitration proceeding or other action with respect to SoCalGas's claims against Transwestern for contamination of its pipelines and agreed to a tolling of the applicable statutes of limitations until December 1987. The two companies subsequently extended their agreement to January 1988. In September 1987, SoCalGas wrote to Transwestern demanding arbitration. Monsanto first learned of SoCalGas's claims against Transwestern in 1989 when its records were subpoenaed for the arbitration. SoCalGas and Transwestern entered into a settlement agreement in July 1990 and Transwestern filed this action for equitable indemnity against Monsanto in April 1991.

Thus, the evidence showed Transwestern knew about the PCB contamination no later than 1981 but failed to inform Monsanto. Monsanto did not learn about the PCB contamination until eight years later when its records were subpoenaed for the arbitration between SoCalGas and Transwestern. Monsanto argues the only logical inference which can be drawn from these facts is that Transwestern intentionally kept it in the dark about the PCB problem in a bad faith attempt to prejudice Monsanto's defense of a future indemnity action. We disagree.

If Monsanto was truly in the dark about the problem of PCB contamination until 1989 its argument might have some merit. However, the evidence showed by 1972 Monsanto was fully aware the PCB's in its products were escaping into the environment and was already preparing to defend damage claims resulting from PCB contamination. Monsanto might not have known about the specific claim by SoCalGas against Transwestern until 1989 but it clearly anticipated such claims in 1972 when it attempted to obtain an indemnification agreement from Texas Eastern covering damages to third parties caused by the PCB's in Turbinol. Furthermore, Monsanto can point to no evidence, other than the nine years of negotiation between Transwestern and SoCalGas, to support the inference Transwestern deliberately delayed negotiations and settlement with SoCalGas in order to prejudice Monsanto.

We are not prepared to say nine years of settlement negotiations in a matter as complex as this is unreasonable as a matter of law. It may well have taken this long to resolve the uncertainties and speculation regarding

the extent of the PCB hazard and the costs of remediation. As a potential indemnitor, it was in Monsanto's interests for Transwestern to negotiate the best settlement it could with SoCalGas. The more Transwestern reduced its liability to SoCalGas the more it reduced its ultimate claim against Monsanto. Therefore, we cannot say the trial court erred in failing to draw an inference Transwestern acted in bad faith in failing to give notice to Monsanto.

Even if Transwestern unreasonably delayed giving Monsanto notice of SoCalGas's claims regarding PCB contamination, the trial court did not abuse its discretion in concluding there was no prejudice to Monsanto.

Monsanto claims by the time this indemnity action was filed in 1991, many critical witnesses had died. It contends the loss of these witnesses prejudiced its ability to prove Texas Eastern had assented to its limitations on liability (see discussion above, pt. I) and that it had warned Transwestern of the dangers of PCB's.

As to the limitation of liability issue, Monsanto claims several Texas Eastern employees died who might have testified regarding Texas Eastern's assent to assuming the risk of loss from the use of Turbinol. However, Monsanto does not contend any of its own employees who participated in the negotiations with Texas Eastern were unavailable to testify on this issue. Moreover, Monsanto had the deposition testimony of Texas Eastern executives who played key roles in selecting Turbinol and negotiating the first sales agreements with Monsanto, including the Texas Eastern executive who headed the project and the executive who acted as liaison between Texas Eastern and the independent laboratory retained to test Turbinol.

On the warning issue, Monsanto claims prior to 1981 some of its employees died who might have testified they actually placed warning labels on the Turbinol drums shipped to Texas Eastern and Transwestern beginning in 1970.[6] The trial court found Monsanto was not prejudiced by the deaths of these witnesses. In the early 1970's, long before Transwestern knew of the PCB contamination in SoCalGas's pipelines and long before any of the aforementioned witnesses died, Monsanto began taking steps to defend itself in PCB litigation. As we previously noted, in 1972 Monsanto attempted to obtain an agreement from Texas Eastern which would have indemnified Monsanto in future lawsuits brought by consumers such as SoCalGas damaged by the PCB's in Turbinol. Furthermore, in 1970 Monsanto directed its

---

[6]We note, however, one of these potential witnesses, Quentin Capocefalo, did not pass away until October 1991, two years after Monsanto admits it learned of the claims by SoCalGas against Transwestern and six months after this suit was filed.

employees to make a written record of all PCB warnings to its customers. In addition, in 1971 its legal department conducted a search to find every PCB-related document in the files of every Monsanto employee in anticipation of litigation. These documents would have included contracts and labeling records pertaining to Turbinol. Finally, Monsanto presented the testimony of the supervisor of the employees whom it claims labeled the Turbinol drums. He testified about the importance of the labels, that the company's labeling policy was followed and that he personally saw the labels on the drums. The Monsanto employee charged with overseeing all of the company's PCB activities also testified he saw the warning labels on the drums of Turbinol.

This is not a case like *Gerhard* v. *Stephens* (1968) 68 Cal.2d 864 [69 Cal.Rptr. 612, 442 P.2d 692] in which almost all persons who participated in, or had knowledge of, the transactions at issue had died or lost their memory. (*Id.* at p. 904, fn. 44; and see *Getty* v. *Getty* (1986) 187 Cal.App.3d 1159, 1170-1171 [232 Cal.Rptr. 603].) Here, Monsanto had available the testimony of most of the key players in its transactions with Texas Eastern and Transwestern. In addition, it had been on notice for many years about the potential for litigation arising from its use of PCB's and had taken steps to preserve evidence for use in such litigation. We cannot say the trial court abused its discretion in finding no prejudice to Monsanto from the lack of earlier notice of PCB contamination in the SoCalGas pipeline.

III. *Transwestern Is Entitled to Equitable Indemnity From Monsanto for the Cost of Remediating the PCB Contamination of the SoCalGas Pipeline System.*

Monsanto argues the trial court erred in submitting the case to the jury on theories of strict liability and negligence because the damages paid to SoCalGas, for which Transwestern sought indemnification, represented compensation for economic loss, not property damage.

The parties agree economic loss is not recoverable in an action for strict products liability (*Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9, 15 [45 Cal.Rptr. 17, 403 P.2d 145]) and is only recoverable in a negligence action under certain special circumstances. (*J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 808 [157 Cal.Rptr. 407, 598 P.2d 60]; *Ott* v. *Alfa-Laval Agri, Inc.* (1995) 31 Cal.App.4th 1439, 1448 [37 Cal.Rptr.2d 790].) Transwestern

concedes these special circumstances are not present here.[7] Property damage, on the other hand, is recoverable in strict products liability and in negligence without the necessity of showing special circumstances. (*Pisano v. American Leasing* (1983) 146 Cal.App.3d 194, 197 [194 Cal.Rptr. 77].) Thus, the issue for us to decide is whether SoCalGas suffered "economic loss" or "property damage" from the presence of PCB's in its pipelines. This is a question of law which we review de novo. (*Sacramento Regional Transit Dist. v. Grumman Flxible* (1984) 158 Cal.App.3d 289, 294 [204 Cal.Rptr. 736].)

In contending SoCalGas's loss was purely an economic one, Monsanto argues the evidence did not show the presence of PCB's caused any harm to SoCalGas's property. The pipes still piped, the pumps still pumped and the meters still metered just as well as they had before. The only harm to SoCalGas was the increased cost of performing the routine business operation of collecting, storing and disposing of the pipeline condensate once it was discovered the condensate contained PCB's. In other words the "damage" to SoCalGas was to its profits, not its property.

In support of this economic loss argument, Monsanto points out that although there was evidence PCB's entered the SoCalGas pipelines in 1968, SoCalGas was not "damaged" until it discovered their presence in 1981. This discovery triggered the provisions of the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) which required SoCalGas to take additional and more costly steps in managing the PCB-laced condensate. Thus, SoCalGas was damaged by government regulation, not by PCB's. If Congress repealed the Toxic Substances Control Act, or if the Environmental Protection Agency (EPA) scaled back its PCB regulations, SoCalGas's "damage" would disappear.[8] Therefore, Monsanto concludes, the damage SoCalGas sustained was the result of decisions by government regulators which increased the cost of performing ordinary business operations—a classic example of economic loss not recoverable in tort.

To illustrate its point, Monsanto submits the following hypothetical. If an automobile manufacturer sells a rental car company a fleet of vehicles lacking a feasible safety device, the manufacturer may incur tort liability if

---

[7]In responding to Monsanto's economic loss argument, Transwestern does not contend the circumstances are present here which would permit recovery for economic loss on a negligence theory. Rather, it relies exclusively on its argument the loss here resulted from property damage.

[8]We take judicial notice of the EPA's proposed amendments to its rules regarding PCB's published in the December 6, 1994, 59 Federal Register 62788 et seq. (Evid. Code, §§ 452, 459.)

one of the vehicles causes injury to persons or property as a result of the defect. However, if the government determines all vehicles should be retrofitted with the safety device, the cost of complying with this precautionary safety measure mandated by the government would be an economic loss recoverable, if at all, in contract not in tort. In the present case SoCalGas, like the hypothetical rental car company, suffered no damage to its tangible property. Rather, it suffered an economic loss resulting from the costs of complying with government mandated safety measures.

Monsanto stresses the importance of maintaining strict limits on the concept of property damage in order to "prevent expansive tort theories and their extravagant remedies from gaining a foothold in the commercial context." Even the California Supreme Court, arguably the leader in the development of product liability law, stopped short of permitting recovery for lost profits in strict product liability cases. (*Seely* v. *White Motor Co*, *supra*, 63 Cal.2d at pp. 16-17.)

In *Seely*, plaintiff purchased a truck manufactured by the White Motor Company for use in his heavy-duty hauling business. The truck had a tendency to bounce violently when put to the task of hauling—a condition known in the industry as "galloping." (63 Cal.2d at p. 12.) Plaintiff sued White on theories of breach of warranty and strict products liability seeking, among other things, the profits he lost because he was unable to use the galloping truck for its intended purpose of hauling heavy loads. The Supreme Court affirmed the trial court's award of lost profits on the basis of express warranty but went on to state these economic losses were not recoverable under strict liability.

Chief Justice Traynor, writing for the majority in *Seely*, *supra*, pointed out, "Although the rules of warranty frustrate rational compensation for physical injury, they function well in a commercial setting." (63 Cal.2d at p. 16.) The rules of warranty function well in a commercial setting, Traynor explained, because they determine the quality of the product the manufacturer promises and thereby determine the quality it must deliver. Moreover, the rules permit the parties to a sale to bargain over the extent of the warranties or to agree to no warranty at all. Strict liability for economic loss, however, could not be disclaimed because one purpose of strict liability is to prevent a manufacturer from defining the scope of its responsibility for the harm caused by its products. (*Id.* at p. 17.) Application of the rules of warranty also prevents a manufacturer from being exposed to damages of an unknown and unlimited scope. (*Ibid.*)

Even if the defendant's defective product caused damage to the plaintiff's property as well as a loss of profits, the plaintiff cannot use the property

damage to bootstrap recovery for the economic loss in a strict liability action. In *Pisano* v. *American Leasing, supra,* the plaintiff, a cabinetmaker, alleged a sander he leased from defendants was defective and damaged wooden cabinets he was making for a customer. As a result, the customer canceled his contract. Among other things, plaintiff sought damages for his lost profits and the additional expenses he incurred in repairing the damaged cabinets. The Court of Appeal reversed summary judgment for defendants on plaintiff's causes of action for strict liability and negligence. The court held that under the negligence cause of action plaintiff could recover both the cost of repairs and his lost profits but under the cause of action for products liability he could recover only for the damage to his cabinets caused by the defective sander. (146 Cal.App.3d at p. 197.)

Monsanto further contends allowing recovery for the increased cost of a normal business activity—collection and disposal of condensate—by calling this increased cost "property damage" would effectively overrule *J'Aire Corp.* v. *Gregory, supra,* and its progeny. These cases permit recovery for economic loss in negligence actions but only in limited circumstances, one of which is "the injury is not part of the plaintiff's ordinary business risk." (24 Cal.3d at p. 808.) Given the fact Transwestern has not even argued it is entitled to economic damages under the *J'Aire* line of cases, it should not be permitted a backdoor recovery of such losses under the guise of "property damage."

Finally, Monsanto argues the application of tort principles to the present case is particularly inappropriate because Transwestern is not a small, powerless consumer like the cabinetmaker in *Pisano, supra,* who needs the special protection of strict products liability. Instead, both parties here are large, sophisticated corporations who dealt at arm's length in a close commercial relationship and bargained over the specifications of the product which is now claimed to have caused the damage. This is not a battle of David versus Goliath but of one Goliath versus another Goliath. Such a battle should be decided according to the warranty principles promulgated by the Legislature in the Uniform Commercial Code, not according to the strict liability and negligence principles promulgated by judges. (See, Note, *Economic Losses and Strict Products Liability: A Record of Judicial Confusion Between Contract and Tort* (1978) 54 Notre Dame Lawyer 118, 129.)

Transwestern's argument can be summarized more briefly. Turbinol contaminated the pipes and the condensate within the pipes of SoCalGas, thus causing damage to its property. The costs incurred in remediating this Turbinol contamination are recoverable as property damage in strict liability

and negligence. Therefore, Monsanto is liable for comparative equitable indemnity in the proportion found by the jury.

Transwestern's contention PCB contamination constituted property damage, not economic loss, is supported by California cases as well as cases from other jurisdictions.

Although we have found no California case discussing damages for PCB contamination, in *San Francisco Unified School Dist.* v. *W.R. Grace & Co.* (1995) 37 Cal.App.4th 1318 [44 Cal.Rptr.2d 305], the court analyzed the distinction between economic loss and property damage in the context of another toxic substance—asbestos. It concluded economic loss occurs when the toxic substance is merely present but property damage occurs when the toxic substance actually contaminates the plaintiff's property. The school district alleged six of its schools were constructed using asbestos and the asbestos had deteriorated to the point the fibers were being released into the air where they could enter the lungs of the students, school employees and visitors. The district sued in strict liability and negligence to recover the costs of inspecting and removing the asbestos and implementing and maintaining a special asbestos operations and maintenance program. The trial court granted summary judgment to the defendant on statute of limitations grounds, holding the district's awareness of the presence of potentially damaging asbestos triggered commencement of the limitations period. (*Id.* at pp. 1323-1324.) The Court of Appeal reversed. The appellate court held the mere presence of asbestos in the school buildings created economic damage, e.g., reduction in the fair market value of buildings found to contain asbestos. Under *Seely, supra*, this economic harm was insufficient to give rise to a cause of action for strict liability; thus the mere presence of asbestos in the buildings did not trigger the commencement of the statute of limitations. (*Id.* at pp. 1327-1329.) However, once the asbestos began to crumble and disintegrate, contaminating the building with fibers, the plaintiff suffered damage to its property. It was this physical injury from asbestos contamination which triggered the limitations period. (*Id.* at pp. 1329-1330.)

In *Selma Pressure Treating Co.* v. *Osmose Wood Preserving Co.* (1990) 221 Cal.App.3d 1601, 1617 [271 Cal.Rptr. 596] the State of California sued Selma for civil penalties, injunctive relief and damages for the pollution of underground water by Selma's disposal of hazardous waste. Many of the state's claims related to Selma's failure to comply with an administrative order to test the premises and implement remedial measures to correct and prevent future groundwater pollution. Selma sought equitable indemnity from several cross-defendants, including Monsanto, who manufactured or

supplied the chemicals which caused the pollution. The trial court sustained the chemical companies' demurrers to the equitable indemnity claim. The Court of Appeal reversed. The appellate court held the State had a sufficient interest in the groundwater to sue for money damages. (*Id.* at p. 1618.) The court then rejected the claim by the chemical companies the cross-complainants could not seek equitable indemnity because any money owed to the state under its complaint would be in the nature of economic loss. The court stated: "Our earlier finding that the State is entitled to seek damages for injury to its property interests defeats this claim. The State's recovery would be in the nature of [property] damages, not economic loss." (*Id.* at p. 1625.)

In *Quadion Corp.* v. *Mache* (N.D.Ill. 1990) 738 F.Supp. 270, the court held PCB contamination of a building and adjacent land constituted property damage, not economic loss. There the plaintiff sued in negligence and strict liability to recover the costs of cleaning up PCB's defendants deposited while they were in possession of the premises. Defendants moved to dismiss these counts of the complaint on the ground the plaintiff failed to allege the requisite physical harm to the premises. The defendants contended, as Monsanto contends in the present case, that where a toxic chemical contaminates the plaintiff's property but does not actually destroy the property, the harm suffered by reason of the toxic contamination is an economic loss, not property damage. The court rejected this argument. Relying on an opinion by the Illinois Supreme Court in an asbestos contamination case, *Board of Educ.* v. *A, C and S, Inc.* (1989) 131 Ill.2d 428 [137 Ill.Dec. 635, 546 N.E.2d 580], the court concluded it would be "incongruous to argue that there is no damage to other property when a harmful element exists throughout a building which by law must be corrected . . . ." (738 F.Supp. at p. 275, citation omitted.)[9]

Transwestern's contention the costs incurred in remediating PCB contamination are recoverable as property damage in strict liability and negligence

---

[9]Monsanto responds Transwestern's reliance on asbestos cases is misplaced because the court in *San Francisco Unified School Dist., supra,* described such cases as "unique in the law." (37 Cal.App.4th at p. 1325.) What the court found "unique" about asbestos cases was that in most cases in which delayed discovery of a cause of action arises the injury is clear but the identity of the tortfeasor is not while in asbestos cases generally the identity of the tortfeasor is known but when the asbestos will become harmful is not known. Because there is no statute of limitations issue in our case, the unique quality of asbestos cases in this context is not relevant to our analysis. The court in *San Francisco Unified School Dist.* also noted "[t]he nature of the defect and the damage caused by asbestos differs from the defects and damages found in most other strict liability and negligence cases." (*Ibid.*) Interestingly, the case the court cited for this proposition, *Board of Educ.* v. *A, C and S, Inc., supra,* held, despite these differences, the plaintiff stated causes of action for strict liability and negligence based on property damage caused by asbestos contamination in its buildings (546 N.E.2d at p. 588) and is the very same case relied on by the court in *Quadion, supra.*

is also supported by California cases and decisions in other jurisdictions. In *San Francisco Unified School Dist.* v. *W.R. Grace & Co., supra,* the court allowed damages on a negligence theory for the costs of inspection, identification repair and implementation of a special operations and maintenance program to deal with asbestos contamination. (37 Cal.App.4th at pp. 1323, 1329.) In *Selma Pressure Treating Co.* v. *Osmose Wood Preserving Co., supra,* the court allowed a cross-complaint for equitable indemnity against chemical companies for the cost of testing, identification and implementation of remedial measures to correct and prevent further pollution to groundwater from disposal of hazardous waste. (221 Cal.App.3d at p. 1625.) In *Pisano* v. *American Leasing, supra,* the court allowed the plaintiff to recover in negligence for the cost of repairing property damaged by the defendant's defective product, specifically distinguishing these costs of repair from economic damages in the form of lost profits. (146 Cal.App.3d at p. 197.) (See also *Quadion Corp.* v. *Mache, supra,* 738 F.Supp. at p. 275 [holding costs of cleaning up PCB contamination recoverable under negligence theory]; *80 S. 8th St. Ltd. Ptsp.* v. *Carey-Canada* (Minn. 1992) 486 N.W.2d 393, 399; *Northridge Co.* v. *W.R. Grace and Co.* (1991) 162 Wis.2d 918 [471 N.W.2d 179, 186] [holding costs of maintenance, removal and replacement of asbestos material recoverable under negligence theory].)[10]

Monsanto cites three cases from other jurisdictions in which the courts characterized the cost of toxic cleanup or remediation as economic loss. All three cases are distinguishable on their facts.

Two of these cases involved suits by purchasers of contaminated lands against the sellers who contaminated them. In *Truck Components, Inc.* v. *K-H Corp.* (N.D.Ill 1995) 94 C50250, the court disagreed with the reasoning in *Quadion Corp.* v. *Mache, supra,* and held the plaintiffs could not sue in tort for the costs of cleaning up the contamination on the land they purchased from defendant. The court characterized these cleanup costs as economic loss because "[p]laintiffs seek to recover for the diminished value of, and damage to, the property they purchased. They have not alleged injury to anyone or harm to other property." (Typed opn. at p. 9.) In other words, the gravamen of the plaintiffs' claim was loss of the benefit of their bargain or

---

[10]In response, Monsanto cites our opinion in *Ales-Peratis Foods Internat., Inc.* v. *American Can Co.* (1985) 164 Cal.App.3d 277, 289-290 [209 Cal.Rptr. 917] and the decision in *Huang* v. *Garner* (1984) 157 Cal.App.3d 404, 420 [203 Cal.Rptr. 800] for the proposition measures taken to prevent public injury or damage to property constitute economic losses. These cases are not on point, however, because by the time SoCalGas discovered the presence of PCB's in its pipeline system the damage to its property had already occurred. We agree, of course, if Monsanto had fulfilled its duty to warn of the hazards posed by the PCB's in Turbinol, any measures taken by SoCalGas to prevent public injury would not constitute property damage.

the property's failure to meet plaintiffs' expectations. Such a claim belongs in the realm of contract law which deals with "the vindication of economic expectations." (*Ibid.*) In *325-343 E. 56th Street Corp.* v. *Mobil Oil Corp.* (D.D.C. 1995) 906 F. Supp. 669, 681 the court concluded, without explanation, the costs plaintiff incurred from cleaning up the contamination defendant left on the property constituted economic loss. Presumably, the court's reason for its holding was similar to the reasoning in the *Truck Components* case. In the present case, however, neither SoCalGas nor Transwestern purchased contaminated pipes from Monsanto. Furthermore, as we explain below, there is no contention Turbinol was not adequate to the task of lubricating Transwestern's gas compressor. Therefore, this is not a case involving disappointed expectations.

In the third case relied on by Monsanto, a school district purchased heating units for its schools. The district contended the heating units were defective because they discharged carbon monoxide and other noxious gases into the air, subjecting everyone in and around the schools to a risk of death or serious injury. The district sought recovery of the cost of removing and replacing the heating units and the cost it had incurred in daily monitoring of the air quality in and around the schools. (*Sioux City, Etc.* v. *Intern. Tel. & Tel. Corp.*(N.D. Iowa 1978) 461 F.Supp. 662, 663.) The court concluded the district could not recover these costs from defendants on a theory of strict liability because the only injury was to the product itself, the heating unit. The court characterized the district's loss as "loss of the bargain" not recoverable in a strict liability action under Iowa law. The court recognized the district was also suing for the costs of monitoring air quality but concluded these damages were "subsumed under the categories of 'loss of the bargain' and economic loss resulting from a loss of the bargain." (*Id.* at p. 665.) Again, this case is distinguishable on its facts from the case before us. Here, there was no damage to the Turbinol from the PCB's and no claim the Turbinol failed to perform its intended function.

In the case before us, the jury found Monsanto's negligent failure to warn Transwestern about the environmental hazards of PCB's was a direct and proximate cause of the harm to SoCalGas. This harm was clearly in the nature of property damage because the PCB's contaminated the SoCalGas pipelines and the condensate within the pipelines, both of which were the property of SoCalGas. In this respect at least we see no distinction between PCB contamination and asbestos contamination. (See fn. 9, *ante*.)

We reject Monsanto's contention the harm to SoCalGas was economic because the PCB's only made the ordinary business expense of removing

condensate from the pipes more expensive. Monsanto confuses the measure of the damages with the nature of the damage. As the Wisconsin Supreme Court explained in *Northridge Co.* v. *W.R. Grace and Co.*, *supra*, : "While economic loss is measured by repair costs, replacement costs, loss of profits or diminution of value, the measure of damages does not determine whether the complaint is for physical harm or economic loss. . . . In other words, the fact that the measure of the plaintiff's damages is economic does not transform the nature of its injury into a solely economic loss. . . . Physical harm to property may be measured by the cost of repairing the buildings to make them safe." (471 N.W.2d at p. 184, citations omitted.)

Here, SoCalGas attempted to repair its pipes to make them safe by removing the PCB's from the pipe walls. When this effort failed it had no choice but to make the PCB-laden condensate safe through special handling and disposal procedures. We conclude the costs of both activities are recoverable as property damage because both would have been unnecessary if the pipelines had not been contaminated by PCB's from Monsanto's Turbinol.[11] Because we have concluded SoCalGas suffered property damage, the *J'Aire* line of cases is irrelevant to the question of Monsanto's liability for negligence.

We find no merit to Monsanto's argument PCB's did not injure SoCalGas, government regulation of PCB's injured SoCalGas. Government regulators did not manufacture Turbinol, Monsanto did. Government regulators did not choose to use PCB's in Turbinol, Monsanto did. Government regulators did not fail to warn Transwestern of the environmental hazards of PCB's, Monsanto did. Furthermore, Monsanto's argument rests on the cynical assumption SoCalGas would have continued to pollute the environment with PCB's, even though it knew they posed a health and safety risk, unless and until the government told it to stop. Monsanto cites no evidence in the record which shows if government regulators relaxed the rules regarding PCB's, SoCalGas would reduce its remediation efforts. SoCalGas might choose out of caution and concern for the public to maintain or even increase its efforts to safely remove and dispose of condensate containing PCB's.

Finally, we reject Monsanto's contention warranty principles rather than tort principles should apply to this case because the parties were relatively equal in bargaining power, negotiated over the specifications of the product

---

[11]Civil Code section 3333 states: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

and were able to equitably apportion the risks inherent in the transactions. There are two problems with Monsanto's analogy to warranty cases. In the typical warranty case, the plaintiff alleges the defendant's product was inferior in quality or did not work for its intended purpose. In the present case, Transwestern does not contend Turbinol failed to perform adequately as a lubricant for its gas compressor. We also observe the record lacks any evidence the parties anticipated and bargained over the environmental risks of Turbinol at the time the product was developed. It is highly unlikely they did so given the evidence the product was developed years before the risks of PCB's were known. Thus the risk involved here is not one which could have been allocated through negotiation.

We conclude, therefore, on the facts of this case Transwestern's proper remedy lies in tort, not in contract or the Uniform Commercial Code. We conclude further the jury properly awarded damages based on negligent failure to warn. Therefore we need not address Monsanto's additional arguments as to why Transwestern should not be allowed to recover in strict liability.

IV.   *Transwestern Is Entitled to Damages Based on Its Obligation to Contribute to SoCalGas's Future Remediation Costs*

Monsanto objects to the award of damages to Transwestern for future losses it will incur in reimbursing SoCalGas for its remediation costs. Monsanto contends such damages are speculative. We disagree.

The evidence at trial showed SoCalGas had been spending approximately $1.3 million per year on PCB remediation for the past three to four years. SoCalGas projected its remediation expenses would continue at this rate through 1997. It also expected it would continue to incur remediation expenses for the next 10 to 20 years. No evidence was introduced as to the projected costs of remediation beyond 1997. A fair reading of the evidence shows these expenses could increase or decrease somewhat depending on such variables as the amount of contaminated pipe taken out of service at the end of its useful life, the amount of detectable PCB's in various parts of the pipeline system, changes in government regulations on the testing and handling of PCB's, and the rate of inflation.

Thus, it is reasonably certain SoCalGas will incur remediation expenses in the foreseeable future. The exact amount of those expenses need not be capable of precise measurement. As Witkin points out, future damages are based on probabilities. (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts § 1326, p. 784.) Courts in similar cases have routinely awarded damages for

the projected costs of remedying pollution. (See cases cited *ante*, at pp. 529-530 and *T & E Industries* v. *Safety Light Corp.* (1991) 123 N.J. 371 [587 A.2d 1249, 1262-1263, 13 A.L.R.5th 1041].)[12]

### DISPOSITION

The judgment is affirmed.

Lillie, P. J., and Woods, J., concurred.

A petition for a rehearing was denied July 10, 1996, and appellant's petition for review by the Supreme Court was denied September 18, 1996.

---

[12]As we have previously noted, *ante*, page 511, the agreement between Transwestern and SoCalGas can be canceled by either party at the end of each two-year period. Therefore, at oral argument we expressed concern Transwestern might cancel the reimbursement agreement and simply pocket the remainder of the future damages awarded it. Transwestern's counsel responded the agreement with SoCalGas as well as federal law would prevent Transwestern from pocketing the future damages and walking away from its "commitment" to SoCalGas. Monsanto's counsel responded Monsanto had never contested Transwestern's obligation to continue making payments to SoCalGas as long as losses occur. Based on these representations by counsel we do not reach the question whether there was sufficient evidence of liability to support an award of future damages. (See, *Sunset-Sternau Food Co.* v. *Bonzi* (1964) 60 Cal.2d 834, 843-844 [36 Cal.Rptr. 741, 389 P.2d 133].)