Filed 7/23/14  Hoany v. California Pacific Bank CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| HUY HOANG,<br><br>    Plaintiff, Cross-Defendant, and Respondent,<br><br>v.<br><br>CALIFORNIA PACIFIC BANK,<br><br>    Defendant, Cross-Complainant, and Appellant. | A139139<br><br>(Alameda County Super. Ct. No. RG10528400) |

Plaintiff Huy Hoang filed a breach of contract action against defendant California Pacific Bank (Bank), asserting the Bank breached a July 2003 written real estate purchase and sale contract, which included an agreement that the Bank would remediate environmental conditions on the property.  He asserted the contract was breached when the Bank failed to obtain a "no further action letter" (NFAL) from the San Francisco Bay Regional Water Quality Control Board (Water Board) within reasonable time following the close of escrow.[1]  A jury found in favor of plaintiff, awarding him over $2 million in damages.  On appeal, the Bank asserts the judgment must be reversed because (1) the parties' agreement limited plaintiff's remedy to indemnity for remediation costs actually incurred, (2) the evidence is insufficient to support the amount of damages awarded, (3) the damages are speculative and uncertain, (4) plaintiff's remedy is limited to specific

---

[1] A NFAL is also called a "closure letter."  It is a letter from the Water Board stating that the property no longer presents a threat to human health or to the environment, and that the Water Board will not ask for any additional remediation work on the property.

1

performance, (5) the trial court erred in admitting evidence of prior litigation, and (6) damages for loss of plaintiff's ability to refinance were improperly awarded. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. The Property

Prior to plaintiff's ownership, the Bank financed David Wang's purchase of the subject parcel of commercial real property located at 6161 Coliseum Way in Oakland (property). The property was formerly a dry cleaning solvent packaging plant. At the time the Bank made the loan, the property was already contaminated from dry cleaning chemicals that had been stored on the property. Wang subsequently filed for bankruptcy and defaulted on the loan. The Bank obtained title to the property following a foreclosure sale on March 5, 2003.

On May 7, 2003, the Bank entered into an agreement with James Gribi, an environmental consultant, to perform certain remediation on the property in exchange for the Bank's payment of $45,000. The contract listed five specific tasks Gribi was to perform on the property (the Gribi work). The contract expressly noted that the ultimate disposition of this site would be decided by the Water Board. It also advised that Gribi could not guarantee the scope of the work would result in regulatory site closure.

### II. Plaintiff Purchases the Property

On May 30, 2003, the Bank entered into a purchase agreement with plaintiff for the property. Plaintiff was represented in the negotiations by two real estate brokers. The total purchase price was $1,140,000, with plaintiff paying $285,000 down and the $855,000 balance financed by the Bank as a carry-back loan.[2]

In July 2003, plaintiff and the Bank's CEO Richard Chi signed a written agreement entitled "Standard Offer, Agreement and Escrow Instructions For Purchase of Real Estate (Non-Residential)" (Standard Offer). The First Addendum to the Standard

---

[2] Plaintiff paid off the note and refinanced after about two and a half years.

2

Offer (Addendum) identifies the sale as an "as-is" sale. With respect to the environmental quality of the property, the Bank advised plaintiff that the property had hazardous contamination. The Bank's liability to plaintiff for any known or unknown hazardous contamination was specifically limited to the terms stated in Paragraph 29, as set forth in the Addendum.

Under Paragraph 29, the Bank agreed to fund the work specified in the Gribi contract up to $45,000. If additional remediation were to be needed to obtain a NFAL, the Bank had the discretion to authorize additional remediation work up to a maximum cost of $100,000, with plaintiff paying half of the additional costs. Any costs in excess of $100,000 were to be the sole responsibility of the Bank. The Gribi work was to be completed on or before the third anniversary after the close of escrow. Escrow closed on August 6, 2003.

On August 28, 2003, plaintiff entered into a written contract with the Bank and Gribi. The agreement provided that the Bank would undertake to remediate known contamination on the property after the sale to plaintiff closed, and that the Bank and plaintiff would share the cost of the remediation as provided in the purchase agreement. The contract sets forth the five tasks Gribi had agreed to complete: (1) dispose of 20 drums on the property; (2) prepare a work plan for the installation of four monitoring wells at the property; (3) drill the four monitoring wells; (4) monitor them for two years; and (5) prepare a regulatory closure request to send to the Water Board.

The Gribi work was completed in November 2005. Gribi then asked the Water Board for a closure letter. Because the Water Board required further monitoring, Gribi continued quarterly monitoring until March 2011. In June 2012, Gribi tried to enter the property to conduct additional investigations that the Water Board had requested, but he was denied access to the property by plaintiff. The Water Board never issued a closure letter.

3

## III. History of Litigation

### A. Pre-Trial

On July 30, 2010, plaintiff filed a complaint for breach of contract. The complaint alleges that plaintiff purchased the property after relying on the Bank's promise to remediate the property. He asserted their failure to remediate the property within three years from the date of purchase constituted failure of performance and breach of contract. He claimed damages, including the loss of use of the property, the loss of the ability to enter into advantageous financial and loan agreements, and the loss of the ability to sell the property.

On October 29, 2010, the Bank filed a cross-complaint for breach of contract against plaintiff. It alleged that it had paid in excess of $100,000 toward the remediation of the property, and that plaintiff owed the Bank for his share of this amount.

### B. First Phase of Trial

The trial proceeded in two phases. The first phase, involving matters of contractual interpretation, was conducted as a bench trial. This phase of the trial took several days, with six witnesses testifying regarding the purpose of the Addendum's provisions with respect to environmental remediation. The witnesses who testified included plaintiff, plaintiff's real estate broker, Chi, the Bank's former executive vice president, the Bank's legal counsel, and the real estate broker who represented the party that sold the property to Wang.

On April 2, 2012, the trial court filed its order after hearing, resolving certain ambiguities in the parties' contractual agreement. Among other things, the court found the Addendum did not require the Bank to obtain a NFAL by any specific date. The court found the Bank had "agreed to undertake the work specified in the Gribi contract dated May 7, 2003 until a [NFAL] from the [Water Board] as described in the Gribi contract." However, "[t]he purchase and sale contract did not require [Bank] to obtain a 'closure letter' or a 'no further action' letter from the [Water Board] or other applicable

4

environmental agency by any specific date." The court also concluded: "[The Bank] promised to complete the 'Gribi work' however promise did not include a guarantee that the scope of services work would result in 'regulatory site closure' before the third anniversary after the close of escrow."[3]

### C. First Amended Complaint

On April 3, 2012, plaintiff filed a first amended complaint (FAC). The FAC asserts a single cause of action for breach of contract. The FAC alleges: "After relying on the promise of defendant, plaintiff purchased and took title to the real property. However, as of the date of this action defendant has failed to perform the work specified under the terms of the agreement and to perform the remediation of the hazardous contamination on the real property. Defendant's failures to perform the work specified under the terms of the agreement and to perform the remediation of the hazardous contamination on the real property within a reasonable time constitutes a failure of performance and a breach of contract." Plaintiff asserted he had sustained damages including, "the cost of the remediation of the hazardous contamination on the real property, the loss of use of the real property, the loss of the ability to enter into advantageous financial and loan agreements, and the loss of the sale of the real property." The FAC includes a prayer for damages of $4.5 million and an order for specific performance of the subject matter of the agreement.[4]

### D. Second Phase of Trial

The second phase of trial proceeded as a jury trial. Plaintiff's expert witness Robert Kitay testified that it would cost between $3,235,770 and $1,332,990 to remediate the property. Kitay stated that the most expensive item would be the excavation and disposal of 1600 tons of contaminated soil. The difference between the high and low cost

---

[3] The trial court instructed the jury regarding its interpretation of the contract utilizing a modified version of CACI No. 300, "Breach of Contract—Introduction."

[4] Plaintiff subsequently elected damages as his remedy.

5

estimates turns primarily on whether the soil will pass a toxicity leaching test. If it passes, then the soil could be disposed at a nearby landfill for $197.80 per ton ($316,480). If not, it will have to be processed and disposed at a landfill in Utah at a cost of $1,265 per ton ($2,024,000).

On March 6, 2013, the jury returned a verdict in favor of plaintiff using a special verdict form. The jury awarded $2.25 million for the cost to clean up the hazardous contamination described in the sales agreement. It awarded no damages for lost sale of the property. It awarded $70,373 for the excess financing costs of refinancing the property. Total damages awarded were $2,320,373. The jury found against the Bank on its cross-complaint.

On March 14, 2013, the trial court filed its judgment on the jury verdict.

### E. Post-Trial Motions

On May 13, 2013, the Bank filed a motion for judgment notwithstanding the verdict (JNOV) and a motion for new trial. In its JNOV motion, the Bank claimed the evidence was insufficient to justify the remediation damages award, and asserted the only appropriate remedy was specific performance. It also contended its liability was limited to indemnity for the actual costs of remediation, and challenged the damages awarded for refinancing costs. The motion for new trial challenged the damages award on a variety of grounds.

On June 14, 2013, the trial court denied the Bank's motions for JNOV and a new trial. This appeal followed.

### DISCUSSION

## I. Whether Plaintiff's Damages Are Limited To Indemnity

### A. The Indemnity Provision

The Bank first contends the judgment must be reversed because the express terms of the Addendum limit any liability for failure to obtain a closure letter to indemnity only. As plaintiff has yet to incur any remediation expenses, the Bank asserts the jury's award

6

of remediation damages was "legally erroneous" because there is no present loss to indemnify.

Paragraph 28 of the Addendum (captioned "AS-IS SALE") contains an acknowledgement that plaintiff had the opportunity to inspect the property and was relying solely on his own investigation and review of information and documentation affecting the property, and not on any information provided by the Bank except to the extent the Bank had advised him of the hazardous contamination. The penultimate subdivision under this acknowledgment states: "[The Bank] shall have no liability to buyer for any known or unknown hazardous contamination on the property, except as set forth herein." Paragraph 29(A) provides, in part: "Seller agrees to indemnify, protect, hold harmless, and defend . . . buyer, . . . from and against any and all claims, costs and liability arising from the failure to obtain a 'no further action' letter from the [Water Board], and those matters alone."

Reading these two provisions together, the Bank asserts the contract limited plaintiff's remedy for failure to obtain a closure letter to a prayer for indemnity. It asserts it cannot be held liable for the award of remediation damages because plaintiff has yet to suffer an actual loss within the meaning of Civil Code section 2778, subdivision 2, which provides: "Upon an indemnity against claims, or demands, or damages, or costs, expressly, or in other equivalent terms, the person indemnified is not entitled to recover without payment thereof."

### B. Whether the Contention is Waived

Plaintiff asserts the Bank failed to preserve the issue of indemnity at trial. We observe the Bank did not raise the theory of indemnity until after the jury had returned its verdict. The argument does not appear in its trial brief, and this theory was not argued to the jury. In spite of the fact that there was no dispute plaintiff had yet to incur remediation costs, the Bank did not object to the special verdict form on this basis in the court below. It also did not object to the jury being instructed on the measure of damages

7

for breach of contract. Nor did the Bank specifically assert this ground as an affirmative defense, or raise this issue with the court prior to or during the trial. Instead, it waited until the jury had rendered its verdict. Thus, it appears the Bank made a strategic decision to allow the jury trial to proceed under a theory of breach of contract.

We conclude the indemnity issue was waived due to the Bank's failure to object to the procedures followed during the jury trial. The relevant rule is: " 'An appellate court will not consider procedural defects or erroneous rulings where an objection could have been, but was not, raised in the court below.' [Citation.] It is unfair to the trial judge and to the adverse party to take advantage of an alleged error on appeal where it could easily have been corrected *at trial*. [Citations.]" (*Children's Hosp. & Medical Center v. Bontà* (2002) 97 Cal.App.4th 740, 776-777, italics added.) While, technically speaking, the Bank did raise the issue prior to filing its appeal, we cannot condone the practice of delaying resolution of a potentially determinative issue at such a late stage in the trial court proceedings, especially given the strong public policy in favor of conserving our scarce judicial resources.

### C. Irrespective of Waiver, the Claim Lacks Merit

Even if the Bank has not waived this issue, we conclude its argument lacks merit. "Under California law, an 'indemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties or of some other person.' (Civ. Code, § 2772.) 'An indemnity against claims, or demands, or liability, expressly, or in other equivalent terms, embraces the costs of defense against such claims, demands, or liability incurred in good faith, and in the exercise of a reasonable discretion . . . .' (Civ. Code, § 2778, subd. 3.) An indemnitor in an indemnity contract generally undertakes to protect the indemnitee against loss or damage through liability to a third person. [Citation.]" (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 968.)

8

"Although indemnity generally relates to third party claims, 'this general rule does not apply if the parties to a contract use the term "indemnity" to include direct liability as well as third party liability.' " (*Zalkind v. Ceradyne, Inc*. (2011) 194 Cal.App.4th 1010, 1024, citing *Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547, 555.) " '[T]he question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control. When the parties knowingly bargain for the protection at issue, the protection should be afforded. This requires an inquiry into the circumstances of the damage or injury and the language of the contract; of necessity, each case will turn on its own facts.' [Citation.] The indemnity provisions of a contract are to be construed under the same rules for interpreting contracts, ' "with a view to determining the actual intent of the parties." ' [Citations.]" (*Zalkind v. Ceradyne, Inc*., supra, 194 Cal.App.4th at pp. 1024-1025.)

Here, the two provisions the Bank relies on do not suggest an intent to limit plaintiff's contractual remedies to indemnity. Paragraph 28 pertains to representations as to the condition of the property only, and expresses the concept that plaintiff is purchasing the property at his own risk. The effect of such provisions is to insulate a seller from liability for fraudulent misrepresentation. "[T]he 'as is' sale simply means the buyer accepts the property in the condition visible or observable by him. An added provision in the waiver clause . . . indicating the buyer relies on his own inspection of the property, presumably waives any obligation the seller or his broker may otherwise have to inspect the property for defects, and hence may avoid a claim for negligent failure to know of and advise of such defects." (*Loughrin v. Superior Court* (1993) 15 Cal.App.4th 1188, 1195.) Understood as such, the limitation on liability that appears within this paragraph ("Seller shall have no liability to buyer for any known or unknown hazardous contamination on the property, except as set forth herein"), is simply intended to limit the Bank's liability in connection with any representations it may or may not have made as to

9

the condition of the property. It cannot reasonably be understood to limit plaintiff's remedies for breach of contract to the indemnity provisions that follow in Paragraph 29. Thus, even if the indemnity provisions can be construed to cover first party claims, the contract itself does not foreclose plaintiff from recovering damages for breach of contract beyond those that fall within the scope of Civil Code section 2778, subdivision 2. Accordingly, we find no error in the trial court's denial of the Bank's JNOV motion on this basis.

## II. Sufficiency of Evidence of Damages for Remediation

The Bank contends the jury erred in awarding over $2 million dollars in damages for remediation, asserting the evidence was insufficient to support plaintiff's expert's contention that the 1,600 tons of soil actually had to be removed. We evaluate this contention under the substantial evidence standard of review. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

### A. Plaintiff's Case

#### 1. Testimony of Plaintiff's Expert Witness Robert Kitay

Robert Kitay is a senior geologist with an environmental consulting firm, called Aqua Science Engineers (Aqua Science). He was retained by plaintiff as an expert witness to give his opinion as to the contamination on the site and the costs of remediation.

In the late 1990's, Aqua Science was asked to investigate the same property at issue here to determine if there was any contamination. Soil and groundwater samples revealed significant contamination at the site. The site had housed a facility that sold cleaning supplies, including a dry cleaning solvent called Perchloroethylene (PCE). There was an aboveground storage tank for this chemical located on the property. The chemical would be offloaded from railcars and trucks and piped over to the storage tank. The contaminant levels in the ground were highest in those offloading locations, suggesting product was spilled on the ground during transfer. Testing results done in

10

1998 showed extremely high concentrations of PCE in the soil and groundwater. There were 3,800 parts per million in the soil, and 82,000 parts per billion in the groundwater.

In 1999, Aqua Science prepared another evaluation report. They drilled 21 separate borings. Their findings confirmed significant contamination, especially near the aboveground tank, by the old railroad track, and near the street. The contamination levels tailed off going away from these three hot-spots, but Kitay did not find any areas on the property that were free of PCE.

In preparation for trial, Kitay reviewed the various reports generated over the years for the Water Board, including the ones prepared by his firm as well as by Gribi. Gribi had taken air, soil, and water samples. Gribi's test results showed high soil vapor contamination. Also, in 2001 Gribi excavated some soil where the aboveground storage tank had been, as well as near the roadway in one of the spill locations.

In Kitay's opinion, continued investigation and monitoring of the property will not result in a NFAL. Instead, an extensive clean up will be required. This is because the test results have shown contaminant concentrations in the soil as high as 8,800 parts per million, whereas the environmental screening level (ESL) is 0.69 parts per million. Additionally the concentrations in the groundwater are as high as 28,000 parts per billion, whereas the ESL is five parts per billion. While the levels do not necessarily have to be at the ESL to obtain a NFAL, it is necessary to show that the concentrations are decreasing and are no longer a threat.

Kitay testified that the best remediation method for the property would be to excavate the soil that contains very high concentrations of contaminants and send it to an appropriate disposal facility. He also recommended injecting a product to stimulate bioremediation (microbes that eat chlorinated solvents), as well as some sub-slab soil-vapor extraction. He estimated 1,600 tons of contaminated soil would have to be removed. Depending on how toxic the soil is, it would thereafter be transported either to

11

a landfill located in California or, if the soil exceeded certain environmental standards, to an out-of-state site for incineration.

In calculating the total potential cost of remediation, Kitay included items such as additional soil borings, assessment of the extracted soil to determine the proper disposal method, drilling additional groundwater monitoring wells, excavation and disposal of soil, renting tents to control air contamination during excavation, water pumping and disposal, sub-slab vapor treatment, and groundwater remediation. The total high-end cost would be $3,235,770. The total low-end estimate was $1,332,990. The low-end estimate will result if the excavated soil can be treated in California, and also if tenting is not required. On cross-examination, Kitay stated that he could not guarantee a NFAL would issue even after all the proposed remediation was completed. He does not work for the Water Board, and cannot control the Board's actions.

### 2. Testimony of David Allen

David Allen is the vice president of Aqua Science. He handles engineering tasks for the firm. Based on the work Aqua Science did in the late 1990's and the more recent data obtained from other consultants, his firm devised a plan to remediate the property's contamination problems. Consistent with Kitay's testimony, Allen stated that the plan takes a three-phase approach: (1) soil excavation, (2) groundwater treatment, and (3) soil vapor extraction. Depending on test results, the excavated soil would need to be transported either to Southern California or to Utah, which is the closest site if the material has to be incinerated. Allen confirmed Kitay's testimony as to the difference in price between the two disposal options.

Allen estimated the actual work would take eight to ten weeks. Thereafter, the Water Board would likely require monitoring for approximately two years before issuing a NFAL in order to ensure that the PCE concentrations have not rebounded.

### 3. Testimony of James Gribi

James Gribi is a geologist with his own environmental consulting business. He testified that he was initially contacted about the property in the summer of 2000. He was hired by Wang to review sampling reports that had been prepared by Aqua Science, among others, and to prepare a remediation plan. He eventually told Wang that he thought it would take two to three years to complete the work to the satisfaction of the Water Board. He estimated the work could cost as much as $250,000.[5] The work plan included investigative activities and also remediation work at the three hot-spot areas identified previously. He removed 100 cubic yards of contaminated soil and 5,000 gallons of contaminated groundwater. After this work was done, Gribi continued to monitor the site. In April 2001, he wrote a letter to the Water Board, believing that site closure would be forthcoming.

In October 2001, the Water Board directed further groundwater monitoring and ordered all soils containing PCE concentrations greater than eight milligrams per kilogram to be excavated and removed from the site. Gribi removed an additional 30 yards of soil in October 2001. After Wang declared bankruptcy, Gribi entered into an agreement with the Bank in 2003 to resume work on the site. At that time, Gribi believed closure might be possible with limited additional effort. He proposed the five tasks (the Gribi work) summarized above, which he believed would lead to site closure. He completed the five tasks within three years of entering into the contract with the Bank.

In July 2003, the Water Board issued a directive requesting a work plan to define the extent of the pollution and to recommend final remedial action alternatives. Gribi requested site closure from the Water Board in December 2004 and again in November 2005. In August 2010, the Water Board issued another directive asking for remediation

---

[5] When Wang purchased the property, the seller, the Bottino Trust, placed a deposit of $250,000 in an escrow account in the Bank. The money was to be used towards obtaining regulatory closure of the site.

alternatives. Gribi did not submit any remediation alternatives. He continued to monitor the groundwater up until March 2011 and was last on the property in June 2012. Since that time, he has been denied access to the property.

### B. Sufficiency of the Evidence

Under the standard of review applicable here, we must consider all the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference from the evidence tending to establish the correctness of the jury's determination, and resolving conflicts in support of the trial court's judgment thereon. "[T]he test is *not* the presence or absence of a substantial conflict in the evidence. Rather, it is simply whether there is substantial evidence in favor of the respondent. If this 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631, italics in original.)

The Bank claims neither Kitay nor Allen explained how they arrived at the 1600-ton figure, noting they pointed to only three areas on the property where soil had to be removed. The Bank observes that the testing results relied on by Kitay indicate that only two of the 15 soil borings showed a concentration of PCE over the ESL. Both of these borings were located in the street offloading area. The Bank notes that the testing results for the other two areas Kitay claimed required remediation all show PCE levels that are below the ESL, suggesting Kitay's opinions as to the quantity of soil that needs to be removed are unfounded. Relying on *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113 (*Zuckerman*) and *Mangini v. Aerojet-General Corp.* (1996) 12 Cal.4th 1087 (*Mangini*), the Bank asserts that, without knowing the exact nature and extent of the contamination, plaintiff's witnesses' opinions as to the cost of remediation

14

have no evidentiary value because they are not supported by proven facts and instead are based on speculation and conjecture.[6]

Evidence Code section 801 provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."[7]

"The value of opinion evidence rests not in the conclusion reached but in the factors considered and the reasoning employed. [Citations.] Where an expert bases his conclusion upon assumptions which are not supported by the record, upon matters which are not reasonably relied upon by other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value. [Citations.] In those circumstances the expert's opinion cannot rise to the dignity of substantial evidence. [Citation.] When a trial court has accepted an expert's ultimate conclusion without critical consideration of his reasoning, and it appears the conclusion was based upon improper or unwarranted matters, then the judgment must be reversed for lack of substantial evidence. [Citations.]" (*Zuckerman, supra,* 189 Cal.App.3d 1113 at pp. 1135-1136.)

---

[6] We note when the Bank cross-examined Kitay, it did not ask him to explain why he would recommend the removal of soil in areas in which the borings showed contamination levels below the ESL.

[7] Both Kitay and Allen were designated as expert witnesses. The Bank did not file any motions in limine seeking to limit the scope of their testimony.

In *Mangini, supra,* property owners sued a solid-fuel manufacturer that had leased the property from the owners and had contaminated it with toxic waste. The property owners sought damages under continuing nuisance and continuing trespass theories. (12 Cal.4th 1087 at pp. 1090-1092.) The plaintiffs' expert hydrogeologist testified, " 'there's not enough known about the site yet to assess what remedial measures need to be done or can be done out there effectively. . . .' " (*Id*. at p. 1095.) In his opinion, remediation costs could have ranged between $20 million and $75 million, depending on the amount of acreage to be decontaminated and the depth of excavation required. (*Ibid.*) The appellate court concluded, and the Supreme Court affirmed, the plaintiffs had failed to present substantial evidence that the contamination was capable of being abated at a reasonable cost, which was fatal to their action for continuing nuisance. (*Id.* at pp. 1095-1096.)

In the present case, it is uncontroverted that at least a portion of plaintiff's property contained very high levels of PCE contamination as late as 2010, when the relevant soil boring results were obtained. Although Kitay testified the precise extent of the contamination could not be determined without more testing, his remediation scenarios contemplated excavating soil from the three known hot-spots to resolve the contamination. Further, in contrast to the situation in *Mangini,* here, Kitay and Allen testified as to specific costs for the different aspects of remediation, not to an indefinite range of costs. (12 Cal.4th at p. 1095.) While it does appear only one or two of the relevant boring samples were above the ESL, Kitay relied on other evidence in forming his opinions, and he also had personal experience in evaluating the site.[8] We also note

_____

[8] We note the Bank did not offer any expert witness testimony to contradict Kitay's conclusions. The only opposing testimony came from Gribi, who was not offered as an expert witness. Gribi testified that he did not agree that soil removal was the best way to address the contamination on the property. In his view, the adverse impact is primarily to the groundwater, and he would recommend using chemical injections instead of removing more soil.

16

the Bank did not raise any evidentiary objections to Kitay's or Allen's opinion testimony. Nor did the Bank challenge the proffered jury instructions on how to evaluate expert testimony. Based on our review of the record, we do not concur with the Bank's contention that Kitay's opinion regarding his proposed remediation plan is unsupported by substantial evidence. Accordingly, we find no error.

### III. Whether Damages Are Speculative or Excessive

The Bank contends the evidence supporting the remediation damages awarded is speculative and uncertain. It also claims the damage award is excessive. We disagree.

As a general matter, damages are adequately proven if they are reasonably certain. (*Transwestern Pipeline Co. v. Monsanto Co.* (1996) 46 Cal.App.4th 502, 532; *Westside Center Associates v. Safeway Stores 23, Inc.* (1996) 42 Cal.App.4th 507, 530-531.) The fact that the amount of damages may be subject to future contingencies does not bar their recovery. "As Witkin points out, future damages are based on probabilities." (*Transwestern Pipeline Co., supra,* 46 Cal.App.4th at p. 532, citing 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts § 1326, p. 784.) A plaintiff seeking to recover for a future loss must show with reasonable certainty that the loss actually will accrue. (*S. C. Anderson, Inc. v. Bank of America* (1994) 24 Cal.App.4th 529, 536-537; *California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 62.) "Damages which are remote, contingent, or merely possible cannot serve as a legal basis for recovery." (*California Shoppers, Inc. v. Royal Globe Ins. Co., supra,* 175 Cal.App.3d at p. 62.) However, the fact that the amount of future damages may be difficult of exact measurement, or subject to various possible contingencies, does not bar recovery. (*Monroe v. Owens* (1946) 76 Cal.App.2d 23, 29-31.) As long as there is a satisfactory method available for obtaining a reasonably proximate estimation of the damages, the defendant whose wrongful act gave rise to the injury will not be heard to complain that the amount thereof cannot be determined with mathematical precision. (*Hacker Pipe &

17

*Supply Co. v. Chapman Valve Manufacturing Co.* (1936) 17 Cal.App.2d 265, 271; see, also, *Natural Soda Products Co. v. City of Los Angeles* (1943) 23 Cal.2d 193, 199-200.)

Here, plaintiff presented evidence as to the potential costs of remediation. While there was uncertainty with respect to whether the excavated soil would ultimately qualify to be treated in California, or whether it would have to be taken to Utah, the evidence was sufficient to support Kitay's estimates as to the cost of each element of remediation that would be needed before a NFAL would issue. The Bank did not object to Kitay's estimates as being based on speculation, either before or during his testimony. As the jury's award falls within his estimates, we cannot say that the award is unduly speculative.

As to excessiveness, the Bank notes that the award of $2.25 million exceeds the $1.14 million price plaintiff paid to purchase the property. In a breach of contract action, "the measure of damages, . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, § 3300.) In regard to damages for breach of contract, it has been said: "The law seeks to give the complaining party the value of his bargain — to prevent a loss which the fulfillment of the contract would have prevented — to put the injured party, so far as money can do it, in the same position as if the contract had been performed." (*Coburn v. California Portland Cement Co.* (1904) 144 Cal. 81, 84.) We will reverse an award of compensatory damages as excessive only when the entire record, viewed most favorably to the judgment, indicates the judgment was rendered as the result of passion and prejudice on the part of the trier of fact. (*Ibid.*)

In a case distinguishing tort-based damages from contract-based damages, the Supreme Court of Louisiana observed that it is "logical in tort cases to tether the amount of damages by balancing the amount to be paid by the negligent tortfeasor against the goal to restore the plaintiff, as closely as possible, to the position which he would have occupied had the accident never occurred." (*Corbello v. Iowa Production* (2003) 850

18

So.2d 686, 695.) However, the damage award for breach of a contractual obligation to reasonably restore property need not be tethered to the market value of the property. This is because the measure of damages in a breach of contract case is governed by the contract. (*Ibid.*) The terms of a contract, which convey the intentions of the parties, overrule any policy considerations behind the rule limiting damages in tort cases. (*Id.* at pp. 694-695.)

In another case involving damages under contract for breach of the agreement, the court observed: "Defendant's completed performance would not have involved undoing what in good faith was done improperly but only doing what was promised and left undone. [Citations.] That the burdens of performance were heavier than anticipated and the cost of completion disproportionate to the end to be obtained does not, without more, alter the rule that the measure of plaintiffs' damage is the cost of completion." (*American Standard, Inc. v. Schectman* (1981) 80 A.D.2d 318, 324; see also *Rock Island Improvement Co. v. Helmerich & Payne, Inc.* (10th Cir. 1983) 698 F.2d 1075, 1079; *Groves v. John Wunder Co.* (1939) 205 Minn. 163, 165.) We find these out-of-state cases persuasive.

While the award exceeds the price plaintiff paid for the property in 2003, the Bank did not argue in advance of the jury's verdict that there was a ceiling on damages based on the purchase price. The evidence supports the conclusion that plaintiff purchased the property with the understanding that the Bank would remediate the property such that a NFAL would be obtained within a reasonable time. The remediation costs were not awarded based on injury to the property, but to enable plaintiff to be in as good a position as if the Bank had remediated his property according to its promise in the contract.[9] Additionally, because of this state's firm policy in favor of environmental remediation

---

[9] We note Gribi testified that he informed the Bank as early as 2003 that other environmental consultants might charge in excess of $1 million to complete the remediation work.

and restoration, we cannot say an award of remediation costs is unreasonable just because it exceeds the amount that the present owner paid for the property.  In sum, we find no error.[10]

## IV.  Specific Performance

The Bank claims the trial court abused its discretion in denying its motion for entry of judgment of specific performance notwithstanding the verdict for damages.  A grant or denial of specific performance is reviewed under the abuse of discretion standard.  (*Real Estate Analytics, LLC v. Vallas* (2008) 160 Cal.App.4th 463, 472.)  "An abuse of discretion occurs only where it is shown that the trial court exceeded the bounds of reason.  [Citation.]  It is a deferential standard of review that requires us to uphold the trial court's determination, even if we disagree with it, so long as it is reasonable.  [Citation.]"  (*Stull v. Sparrow* (2001) 92 Cal.App.4th 860, 864.)

The Bank relies on *Union Oil Co. of California v. Greka Energy Corp.* (2008) 165 Cal.App.4th 129, which considered an oil field that required clean up.  That case is distinguishable.  The plaintiff in that case did not allege a cause for monetary damages, but alleged a cause for specific performance.  The defendant contended that the trial court erred by awarding specific performance because monetary damages would be an adequate remedy.  The Court of Appeal concluded the plaintiff was entitled to specific performance.  The court noted the plaintiff "had the choice of remedies; specific performance *or damages for breach*."  (*Id.* at p. 136, italics added.)

---

[10] The Bank further claims that it "remains the Water Board's responsible party for any future remediation," suggesting that it will be liable for the costs of remediation if plaintiff elects not to clean up the property.  There is no evidence in the record that the Bank will be responsible for clean up going forward.  Cleet Carlton, the Water Board's representative, testified there was no order that required the Bank to remediate the property.  Plaintiff is the owner of the property now, and there is no evidence to suggest that the Water Board or any other governmental agency will seek to impose any financial responsibility on the Bank.

In the present case, plaintiff alleged a cause of action for breach of contract and elected to pursue the remedy of money damages in an amount sufficient to clean up the solvents contaminating his property. As discussed above, the remedy of damages is available to plaintiff and he was not required to elect the remedy of specific performance. Accordingly, we find no abuse of discretion.

## V. *Evidence Regarding the Bottino Trust Litigation*

The Bank asserts the trial court erred in admitting evidence regarding litigation between it and the Bottino Trust. A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion. (*People v. Williams* (1997) 16 Cal.4th 153, 197.)

During the trial, plaintiff called Michael McNaughton to testify. McNaughton was the attorney for the prior owner of the property, the Bottino Trust, which sold the property to Wang. The testimony concerned the $250,000 escrow account designated for environmental remediation that was the subject of the litigation between the Bank and the Bottino Trust. The fund is referenced in a provision that was included in the Bank's agreement with plaintiff. Plaintiff offered the evidence to explain the purpose of the fund was to clean up the contamination on his property, that it was part of the consideration for the contract, and that the Bank had only spent about $42,000 of the fund by the time of the trial. McNaughton testified the Bank claimed it had a right to use the money for remediation, and a lawsuit was filed in 2006 over the fund. We conclude the trial court did not abuse its discretion in permitting McNaughton's testimony because it was relevant to plaintiff's position that the Bank breached the agreement by failing to fulfill its promise to remediate the property.[11]

Even if the trial court erred, we would not find the error to be prejudicial. The Bank claims the evidence was critical to the jury's verdict, yet offers little substance to support this assertion other than contending the jury must have been led to believe that

---

[11] We note the trial court refused to allow testimony regarding the terms of the settlement between the Bottino Trust and the Bank.

the Bank was liable to plaintiff, as a third party had also sued over its failure to remediate the property. In light of all the other evidence that was admitted during the trial, we are unable to concur with the Bank's view that it is reasonably likely it would have obtained a better result in this case but for McNaughton's testimony.

## VI. Award of Damages for Refinancing

Finally, the Bank contends the judgment awarding damages for refinancing should be reversed. The jury awarded $70,373 as damages for excess financing costs to refinance the property.

Plaintiff asserted at trial that he was unable to refinance his property in 2005 at a lower interest rate of 6.75 percent, and instead elected to take a loan at 8.25 percent, allegedly due to the Bank's breach of the contract in failing to obtain a NFAL prior to 2005. The Bank asserts there was no evidence showing that it breached the contract in 2005 because it had until August 2006 (three years from close of escrow in August 2003) to complete the Gribi Work. Even if there had been a breach, the Bank argues that any claim for breach is barred by the four-year statute of limitations under Code of Civil Procedure section 337, subdivision 1. Plaintiffs action was not filed until July 2010, which is more than four years after his attempts to refinance and actual refinancing in 2005.

The FAC alleged that plaintiff suffered damages for the loss of the ability to enter into advantageous financial and loan agreements in August 2006. He claims the evidence proved he is entitled to damages for the excess financing costs he paid between the time of the trial and back in time 2.22 years, which is the exact amount the jury awarded. The 2.22-year period represents the time from the date of filing the complaint to the time of trial.

Plaintiff notes that this action concerns an executory contract that he had fully performed while still waiting for the Bank's performance. In such a contract, the injured party can wait until the time for complete performance by the other party and then bring

22

an action for damages.  The expectant party is not bound to treat the contract as abandoned on the first breach of it, or on any particular breach, but has an election to still expect performance, and the statute of limitations could not begin to run until he had made his election.  (*State Comp. Ins. Fund v. WallDesign Inc.* (2011) 199 Cal.App.4th 1525, 1530.)  The Bank claims the contract was not an executory contract because it could have been performed before the end of the three-year period for performance of the Gribi Contract.  However, the trial court found that the time for the Bank's performance was not three years, but was instead  "reasonable time."  We agree and find no error.

The Bank also contends the trial court erred in admitting the testimony of plaintiff's witnesses who were not competent to testify regarding his efforts to refinance because they lacked personal knowledge of the any refinancing applications made by plaintiff.  Specifically, it asserts plaintiff failed to offer any admissible evidence that any refinancing efforts were unsuccessful due to its alleged breach of contract.  At trial, plaintiff called officers employed with East West Bank, U.S. Bank, and GBC International Bank.  Importantly, we note plaintiff testified he was turned down by many banks in 2005 even before he tried to file an application.  Again, the standard of review as to the admissibility of evidence is abuse of discretion.  (*People v. Williams, supra,* 16 Cal.4th at p. 197.) We cannot say that the trial court abused its discretion in allowing the challenged testimony.

23

# DISPOSITION

The judgment and orders are affirmed.

_____
Dondero, J.

We concur:

_____
Margulies, Acting P.J.

_____
Banke, J.